# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 1:08CR00023 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **ANTHONY "TONY" R. MILLER** | ) | By: James P. Jones |
| **AND CATHERINE W. MILLER,** | ) | Chief United States District Judge |
| | ) | |
| Defendants. | ) | |

*Jennifer R. Bockhorst, Assistant United States Attorney, Abingdon, Virginia, for United States; David L. Scyphers, Scyphers & Austin, P.C., Abingdon, Virginia, for Defendants.*

In this criminal case, involving charges of misrepresentations to the Social Security Administration in order to obtain disability benefits, and concealing the fact that the claimant was working, I find that the evidence was sufficient for the jury to convict. I also deny the posttrial motion for a new trial based on evidentiary rulings.

I

The defendants, Anthony ("Tony") Miller and Catherine Miller, a married couple, were convicted by a jury of knowingly making material false statements or representations in order to obtain Social Security payments in violation of 42 U.S.C.A. § 408(a)(3) (West Supp. 2008). Mr. Miller was also convicted of

concealing or failing to disclose an event he knew affected his continued right to Social Security payments with an intent to fraudulently secure payment when no payment was authorized, in violation of 42 U.S.C.A. § 408(a)(4) (West Supp. 2008).

At trial, the government contended that Mr. Miller, who has severely impaired vision, would be entitled to Social Security disability benefits only if he was not working, and that from approximately 2003 to May 2008, he concealed the fact that he was working from the Social Security Administration ("SSA"). The government presented evidence that during that time period, Mr. Miller worked as a general contractor building houses with his wife and others. The government also alleged that certain statements that Mr. and Mrs. Miller made to the SSA in 2004 and 2006 were materially false. In their defense, the defendants contended that Mr. Miller had not been working during the alleged time period and that Mr. and Mrs. Miller's statements were not false.

In their posttrial Motion for a Judgment of Acquittal, the defendants argue that the government presented insufficient evidence of various elements of the crimes charged. In the Motion for a New Trial, the defendants object to four of my

- 2 -

evidentiary rulings during the trial. The defendants' motions are now ripe for decision.[1]

II

The defendants move for acquittal based on insufficient evidence. The evidence adduced at trial was sufficient for a reasonable jury to convict the defendants beyond a reasonable doubt. Therefore, I will deny the defendants' Motion for a Judgment of Acquittal.

A conviction must be sustained if, viewed in the light most favorable to the government, there is substantial evidence to support it. *Glasser v. United States*, 315 U.S. 60, 80 (1942), *superseded by statute on other grounds as recognized in Bourjaily v. United States*, 483 U.S. 171, 177-78 (1987). I must determine "whether *any* rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Capers*, 61 F.3d 1100, 1107 (4th Cir. 1995) (internal quotation marks and alternations omitted).

The defendants argue that the government presented insufficient evidence for the jury to find beyond a reasonable doubt that the defendants' statements were false,

---

[1] I will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not significantly aid the decisional process.

- 3 -

that Mr. Miller was substantially and gainfully employed, and that the defendants acted with fraudulent intent. I will consider each of these arguments in turn.

A

The defendants contend that the government failed to sufficiently show that the statements made by the defendants were false. Three counts in the indictment alleged false statements. Count One charged Mr. Miller with making a false statement on January 5, 2006, and Count Two charged Mrs. Miller with making a false statement on the same date. Count Three charged Mr. Miller with making a false statement on October 27, 2004.

Evidence at trial showed that in 2004, the SSA discovered that while Mr. Miller had reported earned income to the IRS on his 2002 tax return, he had also received disability benefits in that year. For that reason, the SSA office in Baltimore mailed Mr. Miller a work activity report to discern the extent of his employment, if any. The Baltimore office received a completed work activity report, which included an attached statement dated October 27, 2004, and signed by Mr. Miller. The statement was read to the jury as follows:

> Before the end of 2002 I realized that I just could not do my part [in the construction business] due to my vision and hearing loss. I was almost killed by a truck backing over me and by a beam falling off a house and just missing my head all because I could not see them or hear the truck warning signal. It scared the workers to death. . . . My wife quit her job

- 4 -

as a loan officer at Bank of America and became a licensed class A contractor, and was by my side every step I took. *And most times she had to do whatever was done. I was usually just along for the ride and [to] provide a presence. All I am able to do is to give some advice occasionally, as she now knows as much as I do about the building trade, if not more.* She also did all of the paperwork that went with the construction business. She had to take over the actual running of the business in 2003 to keep it going. If she had not done so, I would have just had to totally quit everything causing the carpenters I was working with to lose their jobs. It turns out that she has a natural talent for the building business, and developed an excellent rapport with the builders and all suppliers. . . . My name remains on the company letterhead as I am known in the area. However, I found you cannot really run this type of business when you have vision and hearing loss to the extent that I now have. *In 2003 the income was supposed to be shown under Catherine Miller's Social Security number* . . . . Since we have filed a joint return neither of us realized the significance of it being under my Social Security number. We had just been used to things in my name as the husband, as wherever you go they ask for the husband's name first. Our accountant has filed an amended tax return for 2003 to correct his error. If further information is needed or any clarification is needed, please contact me and let me know what you need and I will supply it immediately.

(Trial Tr. vol. 2, 151-52, Dec. 5, 2008 (emphasis added).)

The SSA continued to investigate Mr. Miller. On January 5, 2006, Mr. and Mrs. Miller met with a claims representative in the local Social Security office in Bristol, Virginia. The claims representative hand-wrote a statement made by Mr. Miller and typed a statement made by Mrs. Miller on that date. The Millers each signed their respective statements.

Mr. Miller's statement was read to the jury as follows:

- 5 -

> *The self employment earnings posted to my record for 2002 through 2003 belong to my wife, Catherine Miller* . . . . We have a construction company. We build new homes. Catherine has a class A contractor's license. *She does everything in the business. She meets with customers, reads house plans, makes contracts. She does everything.* We have one employee that works for us. Everybody else we use is a subcontractor. I am president of the corporation. I act as an advisor. If someone has a question, I'll answer it. Donald Snead is our only employee, and he'll come pick me up and take me out to the job site, or sometimes I'll go out with my wife to the job site. But *Catherine does all the work.* . . . You may contact Donald Snead and any of our subcontractors to verify *that my work is not substantial and that Catherine does all the work.* . . . Please move the self employment earnings posted to my record for 2002 through 2003 to my wife Catherine's earnings record.

(Trial Tr. vol. 1, 239-40, Dec. 4, 2008 (emphasis added).)

Mrs. Miller's statement was read to the jury as follows:

> *The self employment earnings posted to Anthony's record for 2002 through 2003 belong to me.* I have a class A contractor's license and I build new homes. The business is in both mine and Anthony's names, but *I do all of the work. He will occasionally give advice if needed, or will come to the job site with me, but I do all of the work.* You can contact our subcontractors and the one employee we have to verify this.

(Trial Tr. vol. 1, 241, Dec. 4, 2008 (emphasis added).)

At trial, the government argued that the above statements were false because Mr. Miller did work during 2002 and 2003, Mrs. Miller did not do all of the general contracting work, and the self-employment income listed in the Millers' 2002 and 2003 tax returns was not all attributable to Mrs. Miller.

- 6 -

The government introduced ample evidence that Mr. Miller was working in 2002 and 2003. Government witnesses included homeowners who purportedly had their houses built by Mr. Miller and his associates. For example, Mr. Dickens and his wife Ms. Childers had their home built in 2002. Ms. Childers recalled that she and her husband first became acquainted with Mr. Miller when they saw a house under construction with "Tony's name on it." (Trial Tr. vol. 1, 170, Dec. 4, 2008.) They called Mr. Miller, and he met them at that house and gave them a tour. (*Id.*) They decided to build, and they signed a contract with Mr. Miller and H.E. and Glenda Buchanan, who owned the lot. (*Id.* at 172.) Mrs. Miller's name was not on the contract. (*Id.*) Mr. Dickens remembered negotiating the contract with Mr. Miller. (*Id.* at 161.) During construction, Mr. Dickens spoke with Mr. Miller when questions came up about building, such as where a closet would be. (*Id.* at 162.) Mrs. Miller helped them with finishing touches such as light fixtures, colors, shades, and the yard. (*Id.* at 162-63.)

Mr. and Mrs. Jennings closed on their home in April 2003. Mr. Jennings testified that they first met Mr. Miller when they happened upon a house where Mr. Miller's associate H.E. Buchanan was painting. (*Id.* at 203.) Mr. Buchanan called Mr. Miller, and Mr. Miller came to the house. The three of them spoke for about forty-five minutes and negotiated a price. (*Id.* at 203-04.) Mr. and Mrs. Jennings

- 7 -

later signed a contract with Mr. Miller and Mr. Buchanan; Mrs. Miller's name was not on the contract.  (*Id.* at 205.)  After the Jennings moved into their home, Mr. Jennings would contact both Mr. and Mrs. Miller with questions and concerns.  (*Id.* at 205-06.)  Mr. Miller came personally to fix the commode, which had been off-balance.  (*Id.* at 206.)  Mrs. Jennings mostly spoke to Mrs. Miller, although her questions were not about construction, but rather dealt with details such as "who did you get to clean your house."  (*Id.* at 211.)

Mr. Buchanan testified that he had a partnership with Mr. Miller to build houses in early 2002.  (*Id.* at 222-23.)  He invested money with the understanding that Mr. Miller would oversee the construction of the houses.  (*Id.* at 226.)  Mrs. Buchanan testified that even after she and her husband had stopped building houses with Mr. Miller, Mr. Miller continued to order paint from their paint store.  (*Id.* at 217.)  Mrs. Buchanan testified that "lately" Mrs. Miller had been calling in paint orders, but prior to 2007, Mr. Miller was the one who had placed the orders.  (*Id.* at 220-21.)

The testimony of Mr. and Mrs. Buchanan, Mr. Dickens, Ms. Childers, and Mr. and Mrs. Jennings was corroborated by extensive testimony from other homeowners who had their homes built in 2004 or later.  These homeowners verified that they dealt primarily with Mr. Miller with construction issues, and Mrs. Miller handled

- 8 -

details such as fixtures, colors, and tiles. (*See, e.g.*, Trial Tr. vol. 2, 24, 94, Dec. 5, 2008.) Several homeowners remember specific tasks that Mr. Miller had performed, such as reviewing house plans, (Trial Tr. vol. 1, 188, 196, 253-54, Dec. 4, 2008; Trial Tr. vol. 2, 25, 91, Dec. 5, 2008), using a tape measure, (Trial Tr. vol. 1, 194, 199, Dec. 4, 2008; Trial Tr. vol. 2, 64-65, Dec. 5, 2008), delivering items and unloading his truck, (Trial Tr. vol. 2, 36, 109, Dec. 5, 2008), drawing a diagram, (*id.* at 217, 226), inspecting insulation, (*id.* at 74), mopping up water, (*id.* at 219, 227), and installing a dryer vent (*id.* at 229-30). One homeowner, Mr. Vanderzee, specifically remembered seeing Mr. Miller at the construction site "managing contractors" and "[d]irecting their efforts, pointing out things that needed to be done . . . ." (Trial Tr. vol. 1, 259, Dec. 4, 2008.)

The government also called suppliers, a subcontractor, and local building inspectors to testify. Jason Harris from Builder's Supermarket, a local building supply business, testified that Mr. Miller, who used to work with him at Builder's Supermarket, was the person who would call in orders. (Trial Tr. vol. 2, 191, Dec. 5, 2008.) Patrick Booth, a contract sales representative at 84 Lumber, and Steven Fuller, owner of an excavating company and a trucking company, said that they had dealt with both Mr. and Mrs. Miller. (*Id.* at 196, 201.) William Cole, the county building official, testified that he had had telephone conversations with Mr. Miller.

- 9 -

He said, "In particular, if my employees went out and performed an inspection, and there was some misunderstanding, or misinterpretation, or anything like that, then Mr. Miller would . . . call me and we would discuss it." (Trial Tr. vol. 2, 51, Dec. 5, 2008.) A building inspector, Douglas Cassell, said that Mr. Miller would walk him around the house during an inspection, and "[w]e talked about what was wrong, if he had any questions about something he was doing . . . ." (*Id.* at 81.)

Records of Mr. Miller's cellular telephone use showed many calls made to the building inspector's office. The government argued that these records supported its contention that Mr. Miller was working, because he often made fifty phone calls per day and made up to sixty-five phone calls in one business day, but during holidays such as Christmas and New Year's he would only make up to three phone calls. (Trial Tr. vol. 3, 208, Dec. 8, 2008.)

Paul Ragland, a special agent for the SSA, testified that he had covertly observed Mr. Miller on October 31, 2006, and March 7, 2007. He saw Mr. Miller moving items into and out of the back of his truck, talking to people on site, straightening out sheets of plastic next to a house, and walking around unassisted. (Trial Tr. vol. 1, 122-28, Dec. 4, 2008.) Agent Ragland took photographs during the surveillance, which were admitted at trial.

- 10 -

Agent Ragland also testified about a meeting he had with Mr. and Mrs. Miller on March 8, 2007. During that meeting, Mr. Miller admitted that he had worked thirty-five to forty hours per week since the time he had begun building houses. (Trial Tr. vol. 1, 134, Dec. 4, 2008.) Agent Ragland testified, "they told me that . . . he was the brains of the corporation, and she was the eyes of the corporation." (*Id.* at 136.) Agent Ragland continued:

> [Mr. Miller] advised that [he worked] approximately an eight hour day . . . which would consist of going to the various construction sites . . . directing the contractors, subcontractors. Any problems that arise there at the site that he would be there to rectify, also any complaints that were received from owners of homes that he had built he would try to take care of those at that point. And also he says that he dealt with clients, potential clients by showing them his houses under construction, and then also taking them to see the quality of his work. And he also said that he would also determin[e] prices . . . what he would be asking for as far as a price for those homes.

(*Id.* at 136-37.) "[T]hey both said that . . . they have equal, 50/50 or equal representation in the business. . . . Tony said that he does the construction side of the business and his . . . wife does the paperwork side of the business." (*Id.* at 137.) "Mr. Miller advised me that . . . [Mrs. Miller] did not do all the work in the business." (*Id.* at 140.) This testimony from Agent Ragland was corroborated by testimony from his colleague Agent Rob Childress, who was also present on March 8, 2007. (*See* Trial Tr. vol. 2, 245-46, Dec. 5, 2008.)

- 11 -

While Mr. Miller did not testify, much of the homeowners' and the agents' testimony was contradicted by Mrs. Miller. The defense argued that Mr. Miller was not physically able to do construction work and brought medical experts and construction experts to testify in support of that contention. However, the jury was free to find the government's evidence more credible and reliable. I find that there was more than sufficient evidence for a reasonable jury to conclude that Mr. Miller was working during the relevant time period and that the Millers' statements on October 27, 2004, and January 4, 2006, were false.

B

The defendants argue that the government presented insufficient evidence that any services provided by Mr. Miller were "substantial and gainful." They contend that none of the convictions may be upheld unless there was substantial evidence for the jury to conclude that Mr. Miller's services were "substantial and gainful."

The government was not required to prove that Mr. Miller's work was substantial and gainful in order to satisfy the required elements of Counts One through Three. Those three counts required proof that a defendant made or caused to be made "any false statement or representation of a material fact for use in determining rights to payment" of disability insurance benefits. 42 U.S.C.A. § 408(a)(3); *see United States v. Henderson*, 416 F.3d 686, 692 (8th Cir. 2005)

- 12 -

(stating that proof that the defendant's businesses were "substantial gainful activity" was not a required element of § 408(a)(3)). At trial the defendants argued that the allegedly false statements about the extent of Mr. Miller's work were not "material" unless Mr. Miller's work was in fact substantial and gainful. However, for a statement to be "material," the law only requires that it "has a natural tendency to influence, or was capable of influencing, the decision" of the SSA. *Kungys v. United States*, 485 U.S. 759, 770 (1988).

James Horton, acting district manager for the Bristol district of the SSA, testified that individuals who receive disability benefits are informed that if they go back to work or become self-employed, they must inform the SSA. (Trial Tr. vol. 2, 128, Dec. 5, 2008.) The SSA has complex regulations about how much work a disabled beneficiary can do while maintaining benefit payments, and SSA claims officers use information provided by beneficiaries about how often they work and how much money they make in order to determine whether they remain qualified for payment. (*Id.*) The Millers' statements regarding Mr. Miller's work were therefore material because they were capable of influencing the decision of the SSA. Whether their statements actually influenced the SSA, and whether Mr. Miller was substantially and gainfully employed under the regulations, was irrelevant as to Counts One through Three.

- 13 -

Count Four required the government to prove that Mr. Miller had "knowledge of the occurrence of any event affecting . . . his . . . continued right to any payment" of Social Security benefits, and he "conceal[ed] or fail[ed] to disclose such event with an intent fraudulently to secure payment either in a greater amount than [was] due or when no payment [was] authorized." 42 U.S.C.A. § 408(a)(4); *see United States v. Baumgardner*, 85 F.3d 1305, 1310-11 (8th Cir. 1996). I instructed the jury, without objection, that the government was required to prove that Mr. Miller acted with "the intent to fraudulently secure payment of Social Security disability benefits in an amount greater than was due to him or when no payment to him was authorized." (Jury Instruction No. 11.) The government conceded at trial that it was required to prove that Mr. Miller was not entitled to disability benefits, and that in order to make that showing, the government had to prove that Mr. Miller was substantially gainfully employed.

Mr. Horton testified that as a legally blind individual who had worked in the past, Mr. Miller was entitled to disability benefits so long as he was not substantially gainfully employed. (Trial Tr. vol. 2, 121-22, Dec. 5, 2008.) Under the SSA regulations, Mr. Miller could continue to receive benefits if he worked a minimal amount, but payment would not be authorized if his work was "substantial" and "gainful." (*Id.* at 122.)

- 14 -

Mr. Horton explained that a self-employed person's work is considered "substantial" if he contributes "either one half or more than one half of the total time it takes to manage the company" or if he engages in "45 hours per month of management activity in the business [such as] running the business, making decisions of what the business does . . . ." (*Id.* at 123-24.) Work is "gainful" if it is "the kind of work that's done for pay or profit, whether or not a profit is realized." (*Id.* at 122.) But a blind person may work and continue to receive disability benefits so long as their income does not exceed a certain threshold. In 2002, that threshold was $1,300 per month; in 2003, $1,330 per month; in 2004, $1,350 per month; and in 2005, $1,380 per month. (*Id.* at 130-31.)

The government presented sufficient evidence that Mr. Miller's work was "substantial." The jury could find that Mr. Miller's work was substantial if he *either* did half or more of the work for the business, or he worked at least forty-five hours per month managing the business. Agent Ragland testified that Mr. Miller admitted that he worked eight hours per day and thirty-five to forty hours per week. (Trial Tr. vol. 1, 134, 136, Dec. 4, 2008.) This far exceeds the forty-five hour per month test. Agent Ragland also testified that both Mr. and Mrs. Miller said that "they have equal, 50/50 or equal representation in the business. . . . Tony said that he does the construction side of the business and his . . . wife does the paperwork side of the

- 15 -

business." (*Id.* at 137.) The jury could interpret this to mean that Mr. Miller did half of the work required to run the business, which meets the "half or more than half" test for "substantial" work.

The government also presented sufficient evidence that Mr. Miller's work was "gainful" and his income exceeded permissible amounts. The Millers' tax returns from 2002, 2003, 2004, and 2005 were admitted at trial. These returns showed that the Millers' income during those years ranged from approximately $137,000 to $161,000. The government argued that since there was evidence that Mr. Miller did half of the work required to run the business, the jury should attribute half of this income to Mr. Miller. Half of $137,000 is $68,500 in annual income, which would be $5,708.33 per month. The most Mr. Miller was permitted to earn from 2002 to 2005 while maintaining his benefits was $1,380. The government therefore provided sufficient evidence for the jury to conclude that Mr. Miller earned more income than the maximum permitted.

I find that the government provided substantial evidence for the jury to conclude that Mr. Miller was substantially and gainfully employed and thus his Social Security disability payments were not authorized.

C

Finally, the defendants argue that there was insufficient evidence of fraudulent intent. Each of the four counts against the defendants requires a showing of fraudulent intent. 42 U.S.C.A. § 408(a)(4); *see United States v. Youngblood*, 263 F. App'x 829, 831 (11th Cir. 2008) (unpublished) (holding that "consistent with § 408(a)(4) and the determination of one of our sister circuits, we conclude that the government must establish that the defendant made the false statement with intent to deceive" in order to sustain a conviction under § 408(a)(3)) (citing *Henderson*, 416 F.3d at 692).

The defense compares the Millers to the defendant in *United States v. Phillips*, 600 F.2d 535 (5th Cir. 1979), who had been convicted under 42 U.S.C.A. § 408(d), predecessor to § 408(a)(4). Phillips received Social Security disability benefits when heart failure and lung congestion prevented him from working. *Id.* at 536. He returned to work and did not notify the SSA. The SSA mailed a routine letter to Phillips inquiring into his medical condition and asking if he had returned to work. *Id.* at 537. Phillips, who had a sixth grade education, did not respond to that letter or a second letter from the SSA. When an agent called on Phillips at his home, he was forthright about the work that he had been doing. *Id.* Two years later, Phillips told another agent that he had known that he was supposed to report his work to the SSA,

- 17 -

but he believed that the disability benefits that he received were "rightfully his, regardless of whether he worked or not." *Id.* at 538. The Fifth Circuit held that there was insufficient evidence of fraudulent intent. Although there was sufficient evidence for a jury to conclude that Phillips knew that he was required to report his work activity, there was insufficient evidence that he knew that by withholding that information he was securing payment where none was due. *Id.* Phillips had been forthcoming about his work, not devious. *Id.* at 540.

The facts in *Phillips* are distinguishable from this case. There, Phillips was open and honest about his work activity when he was approached by SSA agents. Here, the Millers cooperated with the SSA to the extent that they turned over tax returns and other requested documents. But in 2004 and 2006 they told the SSA that none of their income was attributable to Mr. Miller and that Mrs. Miller did all of the work, and there was ample evidence that in fact Mr. Miller did do a substantial amount of work.

The defendants argue that if they had fraudulent intent, they would have listed Mrs. Miller's name first on all of their tax returns so that the reported income would not trigger a review of Mr. Miller's disability payments. But a scheme does not have to be complex to be fraudulent. Nor must it be successful; doing something that unravels the scheme does not necessarily indicate that there was no scheme.

Case 1:08-cr-00023-JPJ-PMS   Document 65   Filed 03/25/09   Page 18 of 27   Pageid#: 932

The defendants also argue that the Social Security regulations are simply too confusing; that Mr. Miller, who allegedly has a low IQ,[2] could not be expected to know that he had to report that he was working. But even if Mr. Miller initially did not know that he was required to report his work to the SSA, he certainly knew he was required to do so after he received a work activity report from the SSA in 2004 and was called into the local SSA office to fill out another work activity report in 2006. At that point, the jury could reasonably infer that they made false statements with fraudulent intent and that Mr. Miller concealed his work activity with intent to fraudulently secure payment when none was due.

Fourth Circuit law is clear that intent to defraud "'may be inferred from the totality of the circumstances and need not be proven by direct evidence.'" *United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001) (quoting *United States v. Ham*, 998 F.2d 1247, 1254 (4th Cir. 1993)). I find that there was substantial evidence from which the jury could conclude that the defendants acted with fraudulent intent.

---

[2] Dr. Norman E. Hankins, a defense vocational expert, testified that he had found Mr. Miller's IQ to be 82, but this was based solely on an oral test because Mr. Miller indicated that he was unable to see the materials for reading, arithmetic, and other basic skills tests. (Trial Tr. vol. 2, 271, Dec. 5, 2008.) Dr. Hankins also testified that he assumed that before Mr. Miller's vision was compromised, he had average learning, verbal, and numerical ability because "I believe he's demonstrated he would have at least average ability in each of those areas." (*Id.* at 273.)

- 19 -

III

The defendants move for a new trial based on four of my evidentiary rulings at trial. Upon further consideration, I find that these rulings were correct, and the defendants' Motion for a New Trial will be denied.

A

First, the defendants argue that the court impermissibly prevented them from presenting issues regarding their pending appeal before the SSA. Since the issues defense counsel wished to address were irrelevant under Federal Rule of Evidence 401 and even if relevant would have been confusing and a waste of time under Rule 403, my ruling was correct.

At the time of the trial, the defendants had an administrative appeal pending before the SSA. The defendants initially argued that evidence about the administrative appeal should be admitted for impeachment purposes; the defense hoped to show that the SSA was biased because it wanted to save money by taking away Mr. Miller's disability insurance benefits and Medicaid benefits. (Trial Tr. vol. 1, 14-16, Dec. 4, 2008.) The government argued that the jury would be confused by such testimony because the U.S. Attorney's Office was prosecuting this criminal case, not the SSA, and any alleged money-saving bias on the part of the SSA was irrelevant. (*Id.* at 17.) I ruled that the denial of Mr. Miller's benefits and the pending

- 20 -

appeal were irrelevant to the issues in the case.  The real issue before the jury was whether or not Mr. Miller was working and concealing that fact from the SSA.  (*Id.* at 15-16.)

When Mr. Horton testified regarding the SSA regulations, the government asked several questions about when a blind person's benefits would be terminated. The defense then requested permission to ask Mr. Horton whether his office's decision would be final, or whether there was an appeal pending in the administrative process.  I permitted this single question, but I refused to allow defense counsel to ask questions about whether the SSA was normally required to exhaust the administrative process before referring cases to the U.S. Attorney's Office.  (Trial Tr. vol. 2, 165-67, 180-81, Dec. 5, 2008); *see United States v. Cormier*, 639 F.2d 1177, 1180 (5th Cir. 1981) (agreeing with the government that such "internal regulations provide no rights to benefit recipients").

At that point in the trial, it became apparent that the precise issues involved in the administrative appeal were unclear.  The government contended that the main issue in the appeal was Mr. Miller's work at Builder's Supermarket, the building supply company that he worked at before he started constructing houses.  The defendants countered that the Millers were also appealing the SSA's claim for past benefits in 2002, 2003, and 2004.  (Trial Tr. vol. 2, 182-84, Dec. 5, 2008.)  To avoid

- 21 -

a confusing and irrelevant mini-trial on the issues involved in the Millers' administrative appeal, I gave the following instruction to the jury: "You have heard about an administrative appeal of termination of Mr. Miller's Social Security benefits. I instruct you that any such termination and appeal makes no difference to the issues you must decide in this case concerning the charges against the defendants." (Jury Instruction No. 13.)

The defendants now argue that their administrative appeal was evidence against fraudulent intent. But any currently pending administrative appeal was not relevant to whether or not the Millers made false statements in 2004 and 2006 with fraudulent intent or whether Mr. Miller concealed the fact that he had been working from 2003 to 2008 with intent to fraudulently secure payment when none was due.

B

Second, the defendants contend that the court should not have allowed Agent Ragland's written notes of his interview with the defendants into evidence. However, Agent Ragland's notes were properly admitted to rebut a claim by the defense that he had not taken notes.

During Mrs. Miller's testimony, defense counsel asked her about the meeting the Millers had with Agent Ragland and Agent Childress on March 8, 2007:

Q:    Were they taking any notes?

- 22 -

A:     No.  I never saw them take any notes.

Q:     The whole time they were in your house, not from the beginning
        to end, did you ever see them take a note?

A:     No, sir.

(Trial Tr. vol. 3, 76, Dec. 8, 2008.)

During rebuttal, the government recalled Agent Ragland.  He testified that he did take notes during the meeting with the Millers on March 8, 2007.  (*Id.* at 177-78.) Defense counsel then asked, "Do you have those notes with you?"   (*Id.* at 178.) Agent Ragland responded, "I think they have them," referring to government counsel. (*Id.*)  At that point the government moved to admit Agent Ragland's notes, which I permitted over the defendants' objection.  (*Id.* at 183-86, 191.)

Agent Ragland's notes contain two types of out of court statements that could be characterized as hearsay.   First, there are the statements of the defendants contained in the notes.   Those are clearly admissible as admissions of a party-opponent under Federal Rule of Evidence 801(d)(2)(A).   Second, there were declarations of Agent Ragland, the note taker.

At trial, I gave two alternate reasons for admission of Agent Ragland's declarations in his notes.   One ground was that Agent Ragland's notes were admissible under Rule 801(d)(1)(B) to rebut an express or implied charge of recent fabrication.  (*Id.* at 185.)  The cases construing this rule, however, require that the

- 23 -

motive for fabrication be different at the time the out of court statement was made from the time of the later testimony at trial. *See Tome v. United States*, 513 U.S. 150, 156 (1995). It does not seem as though Agent Ragland had a different motive to fabricate the existence of notes at trial than he would have had prior to trial.

Upon reflection, the other ground upon which I granted admission was more on point. I explained that the only way the government could properly rebut the charge that there were no notes was to introduce the notes themselves. (Trial Tr. vol. 3, 191, Dec. 8, 2008.) The notes were therefore not admitted for the truth of what Agent Ragland had written, but to simply show that there were notes. *See* Fed. R. Evid. 801(c). In other words, the notes had an independent legal significance aside from the truth or falsity of what Agent Ragland heard Mr. and Mrs. Miller say.

The defendants also contend that it was improper to admit the notes because defense counsel had not previously received a copy of the notes. However, prior to admitting the notes, a recess was taken to allow defense counsel to review them. (Trial Tr. vol. 3, 183-84, Dec. 8, 2008.) Under the circumstances, the amount of time allotted for review was appropriate and the notes were properly admitted.

C

Third, the defendants object to evidence that was admitted regarding Mr. Miller's work history prior to the dates charged in the indictment. However, all of the admitted testimony was relevant and admissible.

The defendants object generally to "evidence by individuals of work allegedly done during a time frame outside the time alleged in the indictment," and does not specify which testimony was objectionable. (Mot. for a New Trial ¶ 3.) During the trial, the defendants objected to testimony from John Dickens, whose house was built in 2002, arguing that "this is outside the scope of the indictment." (Trial Tr. vol. 1, 157, Dec. 4, 2008.) I overruled the objection. Although Count Four alleges that Mr. Miller concealed or failed to disclose that he was working from 2003 to 2008, Mr. Dickens' testimony was directly relevant as to Counts One and Two. In their statements on January 5, 2006, the Millers claimed that Mr. Miller was not working in 2002 and that all of the income they received that year belonged to Mrs. Miller. If Mr. Miller was working in 2002, the Millers' statements in 2006 were false.

Testimony about Mr. Miller's work prior to 2003 was also admissible on other grounds. The defendants argued that Mr. Miller was not able to build houses because he was blind. Evidence that he was building houses after he was found to be legally blind in 1994 rebuts that claim.

- 25 -

Testimony that Mr. Miller worked at Builder's Supermarket from approximately 1979 to 2000 demonstrated how he had gained the necessary knowledge and skills to act as a general contractor. The defendants also volunteered the information that Mr. Miller worked at Builder's Supermarket as a reason as to why he was known in the community and why the Millers chose to name their company "Tony Miller Construction Company" in 2004.

In short, all of the evidence admitted regarding Mr. Miller's work experience prior to 2003 was relevant and admissible.

D

Fourth, the defendant contends that certain SSA documents were admitted without a proper foundation. Mr. Horton testified that the SSA maintains a claims folder on everyone who receives benefits. (Trial Tr. vol. 2, 141-42, Dec. 5, 2008.) He testified that he had retrieved certain documents, including Mr. Miller's 1994 application for disability benefits, the Millers' tax returns, and Mr. Miller's 2004 work activity report, from Mr. Miller's claims folder. (*Id.* at 144-47.) I admitted these documents over the defendants' objection.

I elaborated on my ruling outside the presence of the jury, noting that the documents were properly authenticated as public records or reports under Federal Rule of Evidence 901(b)(7). (*Id.* at 177.) Also, to the extent that these documents

- 26 -

contained hearsay, they were admissible as records of regularly conducted activity under Rule 803(6). (*Id.*) Since this evidentiary ruling and the others described above were correct, the defendants' Motion for a New Trial will be denied.

IV

For the foregoing reasons, it is **ORDERED** that the defendants' Motion for a Judgment of Acquittal and Motion for a New Trial are DENIED.

ENTER: March 25, 2009

/s/ JAMES P. JONES
Chief United States District Judge